**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------X

SIMEON FERGUSON, by and through his
next friend, KARLENE GRANT,

               Plaintiffs,

      v.

INDYMAC BANK, F.S.B. and GLOBAL
FINANCIAL, INC.,

            Defendants.

----------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ FEB 14 2008 ★

BROOKLYN OFFICE

CV 08    639

TOWNES, J.

**COMPLAINT**

**JURY TRIAL DEMANDED**

POHORELSKY, M.J.

Plaintiff Simeon Ferguson, by and through his next friend Karlene Grant, and plaintiff Karlene

Grant, herein allege and state as follows:

### INTRODUCTION

1.     Simeon Ferguson is an 86-year-old Brooklyn homeowner who, upon information

and belief, suffers from vascular dementia.  This dementia was evident in early 2006, when

defendants Global Financial and Indymac Bank preyed upon Mr. Ferguson's vulnerability and

fraudulently induced him to refinance his 5.95% fixed-rate mortgage into a highly complex,

deceptive and unaffordable mortgage known as a "Payment Option Adjustable Rate Mortgage"

or  POARM.  Defendants were able to persuade Mr. Ferguson to refinance into an unaffordable

loan by promising to lower his interest rate to 1%.  Unbeknownst to Mr. Ferguson, the initial low

rate of 1.25% lasted for a mere *six weeks*, at which point it jumped to 7.138%.

2.     The POARM was extended to Mr. Ferguson as part of Indymac's stated income

loan program for retirees.  Under this program, borrowers with a FICO score of over 660 are

given stated income loans with terms much more onerous than if their income is documented. A
hallmark of this program is that Indymac refuses to accept loan applications that make any
mention of income, thereby encouraging mortgage brokers to extend unaffordable loans while
attempting to duck accountability by deliberately remaining ignorant of the borrower's ability to
pay the mortgage. In fact, in its own underwriting approval sheet, Indymac stated that "the file
must not contain any documents that reference income or assets." Thus, Indymac willfully
remained ignorant of Mr. Ferguson's income so that it could extend him an unaffordable
mortgage.

3.      Indymac's scheme of extending these loans to retirees on fixed incomes stripped
valuable equity from seniors' properties and put them at grave risk of losing their homes. These
stated income loans contained no benefit for the borrowers, and instead inured solely to the
benefit of Indymac's bottom line.

4.      At the time the subject loan was originated, Mr. Ferguson was living on a fixed
income of approximately $1,126 per month, consisting of social security, disability, and pension.
The initial "minimum" payment for the POARM was $1,482.97, far exceeding Mr. Ferguson's
income. Thus, even on the date of origination, the loan was unaffordable to Mr. Ferguson and
virtually certain to result in foreclosure.

5.      This action seeks to rescind the subject mortgage and terminate any security
interest created by the mortgage, and to enjoin the defendants from enforcing the mortgage and
note.

6.      Defendants' fraudulent and deceptive actions violated numerous federal and state
consumer protection laws, including the Truth in Lending Act; the Real Estate Settlement and

2

Procedures Act; the Equal Credit Opportunity Act; the New York State Deceptive Practices Act; the New York State usury law; and the common law doctrine of fraud.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      This Court has supplemental jurisdiction over plaintiff's pendant state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

9.      Plaintiff Simeon Ferguson, by and through his next friend, Karlene Grant, is an 86-year-old man. He has lived in Brooklyn, New York for more than thirty years.  He currently resides at his home located at 685 Park Place, Brooklyn, NY 11216 (the "subject property"). On or about October 19, 2006, Mr. Ferguson's property was transferred to his daughter, plaintiff Karlene Grant, who is holding the property in constructive trust for Simeon Ferguson. This was done in order to ensure that her father's property was protected against further predatory lending scams until a notice of pendency could be placed on the property.  All further references to "plaintiff" refer to Plaintiff Simeon Ferguson by and through his next friend, Karlene Grant.

10.     Defendant Global Financial, Inc. is a mortgage broker organized under the laws of New York and maintains its principal place of business at 181 South Franklin Street, Suite 202, Valley Stream, New York 11581.

11.     Defendant Indymac Bank, F.S.B. ("Indymac"), a federal savings bank, maintains its principal place of business at 888 East Walnut Street, Pasadena, CA 91101.  On February 15, 2005, Indymac entered into a $445,000 mortgage with plaintiff Simeon Ferguson at his home in

3

Brooklyn, NY, and, upon information and belief, Indymac currently holds the note to that mortgage. Indymac regularly does mortgage transactions in New York State.

## STATEMENT OF FACTS

12.     Simeon Ferguson was born in Jamaica on September 26, 1921, and came to the United States in 1966. In 1975, Mr. Ferguson purchased and moved into the subject property with his significant other. In 1998, Mr. Ferguson became the sole owner of the subject premises.

13.     In or around 2002, Mr. Ferguson's daughter, Karlene Grant, began noticing changes in her father's behavior. Mr. Ferguson began frequently repeating himself, seemingly without knowledge that he had made the same statement before. He also would ask the same questions multiple times, without remembering that he had already asked the question and was given the answer.

14.     By 2006, Mr. Ferguson's dementia had significantly progressed and was evident to those around him. For example, in early 2006, Mr. Ferguson took a trip to Jamaica to see his dying daughter, Ruth Ferguson, who then passed away while Mr. Ferguson was in Jamaica. Shortly after returning from this trip, Mr. Ferguson told Karlene that he regretted not having gone to Jamaica to see Ruth before she passed away, and that he wished to visit Jamaica as he had not been there for a long time.

15.     At the beginning of 2006, Mr. Ferguson was in a fixed-rate mortgage with Option One for $360,000 at a 5.95% interest rate. He had been in this mortgage since May, 2004. An examination of Mr. Ferguson's mortgage history shows that all mortgages prior to the Indymac loan were fixed-rate mortgages.

16.     Upon information and belief, in or around early 2006, Mr. Ferguson was solicited by a telemarketer to refinance his mortgage. Mr. Ferguson told his neighbor, Jim Brown, that he

was refinancing his mortgage at a fixed interest rate of 1%. He told Mr. Brown that some people were coming by to do the paperwork on February 14, 2006 and asked Mr. Brown if he would come over to his house on the day of the transaction.

17.     Upon information and belief, on or around February 15, 2006, two people came to Mr. Ferguson's home with papers for Mr. Ferguson to sign. Mr. Brown came to Mr. Ferguson's home at around 4 p.m. When Mr. Brown arrived, Mr. Ferguson and two other people were sitting around Mr. Ferguson's table. Mr. Ferguson told Mr. Brown that he had already signed the papers, and asked Mr. Brown to go out and make a copy of his social security card and American passport. Mr. Brown made the copies.

18.     Upon information and belief, $63,944 was deposited into Mr. Ferguson's bank account. As Mr. Ferguson did not request this amount, Indymac unnecessarily increased the debt on his home and the amount of fees and costs that he had to pay, increasing the amount of his monthly mortgage payments and placing him at greater risk of foreclosure.

19.     Upon information and belief, in April, 2006, Mr. Ferguson made his first mortgage payment in the amount of $1,482.97.

20.     In or around May 2006, Mr. Ferguson was hospitalized with a bone infection. In or around August 2006, while Mr. Ferguson was still in the hospital, he asked his daughter Karlene to take over his financial affairs. Karlene agreed and started going through her father's bills. It was then she discovered that her father had refinanced his mortgage with Indymac in February 2006. She further discovered that her father had not paid his mortgage or any other bills for five months. The only payment Mr. Ferguson had made on the Indymac mortgage was in April 2006. When Karlene brought this to her father's attention, Mr. Ferguson insisted that he had consistently been paying all of his bills. Karlene then checked Mr. Ferguson's bank account

and discovered that the loan proceeds from the Indymac mortgage were still sitting in the account and had not been touched.

21.     Karlene questioned her father as to why he had taken out an adjustable rate mortgage with Indymac.  Mr. Ferguson insisted that he taken out a fixed-rate mortgage and that he refinanced because Indymac offered him a lower interest rate.

22.     Karlene tried to obtain more information about Mr. Ferguson's loan with Indymac.  She called Global Financial but they refused to speak with her since she was not the mortgagor.

23.     Karlene suggested that Mr. Ferguson temporarily put the property in her name. Mr. Ferguson asked why, and Karlene explained that no one would be able to induce him to refinance if the deed were not in his name. Mr. Ferguson agreed to do so.

24.     With permission from her father, Karlene demanded an explanation for why her father had refinanced into the POARM with Indymac. Global Financial at first claimed that her father had sought out the loan and had a lawyer at the closing. However, Mr. Ferguson in fact did not have a lawyer in any stage of the transaction, and Global Financial later admitted in a letter that Mr. Ferguson was solicited for this loan by a telemarketer.

25.     In November 2006, Ms. Grant wrote a letter to the New York State Banking Department to complain and ask for assistance.  In response to Ms. Grant's complaint, Global Financial wrote a letter to Ms. Grant claiming that Mr. Ferguson was "involved, consulted, and took part through the entire loan process in an intelligent fashion."  Global Financial also stated that he was given the option of several loan programs, and that he decided on the POARM due to its low monthly payment option.

26.     Given that Mr. Ferguson was suffering from acute dementia at the time of the

6

transaction, it is highly unlikely that he was engaged and involved in the process. Furthermore, it defies common sense that someone would decide to refinance a 5.95% fixed-interest loan into an adjustable rate mortgage that jumps to a rate of 7.138% after six weeks and continues to increase thereafter, especially when that person was living on a fixed income.

### THE SUBJECT TRANSACTION

27.     Payment Option ARMs have been called the most complicated mortgage product ever marketed to consumers. They typically have a very low and short-lived teaser rate, which then jumps to a fully indexed rate. Borrowers are required to pay a "minimum payment," which is calculated using the teaser rate. As the minimum payment is not sufficient to pay the interest accrued each month, the shortfall is added to the outstanding principle, causing the loan to negatively amortize. The initial low teaser rate, and the low minimum payment, along with the complexity of the loan, make the POARM an ideal product to mislead borrowers with representations about "low interest rates" and "low payments."

28.     Unbeknownst to Mr. Ferguson, the 1.25% interest rate that he believed was fixed lasted for only six weeks. On April 1, 2006, the interest jumped to the "fully indexed rate" of 7.138%. However, Mr. Ferguson's minimum monthly payment of $1,482.97 was computed based on the 1.25% interest rate, and that payment amount was fixed for one year. Since the interest rate increased drastically on April 1, 2006, Mr. Ferguson's minimum monthly payments failed to cover even the interest that has accumulated each month. Thus, the initial minimum payment of $1,482.97 required to be paid for the first year only prevented the loan from going into default. As the minimum payment was not sufficient to pay the interest that accrued each month, the shortfall was added to the outstanding principle, causing the loan to amortize negatively. For example, the interest that accrued in the first month of the loan was, upon

information and belief, $2,641.07, resulting in $1,158.10 being added to the principal after just one month.

29.     The note provides that the interest rate will change monthly thereafter, according to the movement of an index plus a margin. By December 2007, Mr. Ferguson's interest rate had risen to 8.038%.

30.     Under the terms of the loan, the minimum monthly payment amount is recomputed once each year in order to account for the changes in the interest rate, but the new minimum payment amount cannot differ from the previous one by more than 7.5%. Thus, on April 1, 2007, Mr. Ferguson's new monthly minimum payment amount was $1,903.74—far more than his monthly income and still much less than the amount of interest that accrued each month.

31.     Upon information and belief, the loan also contains a three-year prepayment penalty, which is computed as six months' interest on the principal balance. This method of calculating the prepayment penalty allows for the yield to increase as the principal increases.

32.     According to the February 15, 2006 HUD-1 settlement statement, Indymac paid Global Financial $14,462.50 as a "POC" (Paid Outside Closing) fee, which upon information and belief was a yield spread premium. In addition, the HUD-1 shows that Indymac paid Global Financial $6,875 as a "broker fee." Upon information and belief, Global Financial received this compensation from Indymac solely for the purpose of inducing Mr. Ferguson to take out a loan on terms much less favorable than were otherwise available to him.

33.     Global Financial and Indymac knew or should have known that Mr. Ferguson did not have sufficient income to repay the loan. Indymac's own description on its website of the Payment Option ARM loan underscores the unsuitability of the loan. Indymac describes the

Payment Option ARM as ideal for those who are self-employed, expect to have increased

earnings in the future, or wish to maximize their tax write-offs for mortgage interest. As Mr.

Ferguson is a retiree on a small fixed income, this loan was patently unsuitable for him.

### FRAUDULENT CONCEALMENT

34.     Plaintiff repeats and realleges paragraphs 1 through 33 as though fully set forth

herein.

35.     The defendants materially misrepresented the loan terms to Mr. Ferguson and

made him believe that he was refinancing at a 1% fixed interest rate.

36.     The defendants knew or should have known that Mr. Ferguson would rely on

these misrepresentations in agreeing to take out the refinance.

37.     The defendants further knew or should have known that Mr. Ferguson lacked the

capacity to make an informed judgment about the loan.

**38.**     By calculating Mr. Ferguson's mortgage payments for the first year using the

1.25% interest rate, the defendants continued to conceal the true terms of the loan.

### FIRST CAUSE OF ACTION
### Against Indymac
### TRUTH IN LENDING ACT

39.     Plaintiff repeats and realleges paragraphs 1 through 38 as though fully set forth

herein.

40.     At the time of the subject transaction, defendant Indymac acted as a creditor who

regularly engaged in the making of mortgage loans, payable by agreement in more than four

installments or for which the payment of a finance charge is or may be required, whether in

connection with loans, sales of property or services, or otherwise. Accordingly, Defendant is

subject to the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and its implementing regulations, Federal Reserve Board Regulation Z, 12 C.F.R. § 226.

41.     As a result of the subject transaction, Indymac acquired an interest in Plaintiff's primary dwelling that secures payment or performance of an obligation.

42.     A review of all the documents in Mr. Ferguson's possession and those contained in Mr. Ferguson's loan file that was provided by Indymac shows that Indymac failed to provide disclosures required by the Truth in Lending Act.

43.     In the course of this consumer credit transaction, Defendant violated the disclosure and rescission requirements of TILA and Regulation Z by failing to provide two copies of the right to rescind and an accurate date for the expiration of the rescission period, in violation of 15 U.S.C. § 1635 and 12 C.F.R. § 226.23(b).

44.     Defendant also failed to make required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. § 1621(a) and Regulation Z § 226.17(a) and therefore failed to deliver all material disclosures as required by the Act and Regulation Z, including the following:

        a.  failing to disclose properly and accurately the "amount financed," in violation of 15 U.S.C. § 1638(a)(2) and 12 C.F.R. § 226.18(b);

        b.  failing to disclose properly and accurately the "finance charge," in violation of 15 U.S.C. § 1638(a)(3) and 12 C.F.R. § 226.18;

        c.  failing to disclose properly and accurately the "annual percentage rate," in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 226.18(e);

        d.  failing to disclose properly and accurately the "total of payments," in violation of 15 U.S.C. § 1638(a)(5) and 12 C.F.R. § 226.18(h); and

        e.  failing to disclose properly and accurately the number, amount, and due dates or

period of payments scheduled to repay the obligation, in violation of 15 U.S.C. § 1638(a)(6) and 12 C.F.R. § 226.18(g).

45.     The above violations of the Truth in Lending Act give plaintiff an extended right to rescind the loans held by defendants pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23. Plaintiff is also entitled to an extended right of rescission against any assignees of the loan pursuant to 15 U.S.C. § 1641(c).

46.     On February 14, 2008, Mr. Ferguson rescinded the transaction by mailing a notice of rescission to Indymac's Legal Department.

47.     Defendant also violated the disclosure requirements of TILA and Regulation Z by failing to provide either an itemization of the amount financed, a qualified substitution for the itemization of the amount financed, or a statement that Mr. Ferguson had a right to request such an itemization, in violation of 15 U.S.C. § 1638(a)(2)(B) and 12 C.F.R. § 226.18(c).

48.     As a result of the aforesaid violations of TILA and Regulation Z, Indymac and any assignees are liable to plaintiff for:

    a.   The return of any money or property that has been given to anyone in connection with the transaction and the termination of defendant's security interest in the property;

    b.   Actual damages in an amount to be determined at trial;

    c.   Statutory damages as provided by 15 U.S.C. § 1640;

    d.   Costs and disbursements; and

    e.   Attorneys' fees to Legal Services for the Elderly in Queens.

## SECOND CAUSE OF ACTION

### Against All Defendants

### REAL ESTATE SETTLEMENT PROCEDURES ACT

49.     Plaintiff repeats and realleges paragraphs 1 through 48 as though fully set forth herein.

50.     The Indymac mortgage is a "federally related mortgage loan" as defined in 12 U.S.C. § 2602(1), and therefore is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.*

51.     Defendants Indymac and Global Financial violated RESPA with respect to plaintiff's loan transaction by: (a) giving or accepting kickbacks or other things of value in violation of 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(b); and (b) giving a portion, split, or percentage of charges made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed, in violation of 12 U.S.C. § 2607(b) and 24 C.F.R. § 2500.14(c).

52.     Among other things, no goods or facilities were furnished, nor were any services performed in exchange for the $14,462.50 "POC" listed on the February 15, 2006 HUD-1 Settlement Statement.  Furthermore, even if goods, facilities or services were provided, their value was not reasonably related to the payments.

53.     Therefore, Indymac and Global Financial are liable to Mr. Ferguson for:

a.   Actual damages, trebled under 12 U.S.C. § 2607(d)(2);

b.   Costs and disbursements; and

c.   Attorneys' fees to Legal Services for the Elderly in Queens.

### THIRD CAUSE OF ACTION
### Against All Defendants
### EQUAL CREDIT OPPORTUNITY ACT

54.     Plaintiff repeats and realleges paragraphs 1 through 53 as though fully set forth herein.

55.     Upon information and belief, at the time of the mortgage, Indymac had a stated income loan program for retirees, whereby it extended loans to retirees with a credit score greater than 660 without requiring any documentation of income.

56.     Upon further information and belief, Indymac's stated income program for retirees was targeted at senior citizens.

57.     In the loan extended to Mr. Ferguson, Indymac mandated that the application make no mention of Mr. Ferguson's income.  In Mr. Ferguson's Conditional Approval Notice, Indymac stated that the loan file must not contain any documents that reference income or assets.

58.     Upon information and belief, retirees who were extended a stated income loan under Indymac's program received worse terms than they otherwise would have if they had provided documentation of income.

59.     By refusing to look at the borrower's income when extending these stated income loans to retirees, Indymac brazenly disregarded the seniors' ability to repay the loan. Furthermore, by requiring mortgage brokers to exclude income from the loan applications and paying high yield spread premiums to reward brokers for making stated income loans, Indymac encouraged brokers to make irresponsible loans.

60.     An adjustable-rate mortgage is entirely inappropriate for seniors, as their income is fixed and unlikely to increase.  While borrowers in Indymac's stated income loan program would have qualified for a fixed rate mortgage based on their credit scores, Indymac instead

incentivized brokers to market stated income loans which, upon information and belief, were adjustable rate mortgages with higher interest rates than the borrowers would have qualified for if their income was documented. Global Financial targeted Mr. Ferguson and, upon information and belief, other seniors for its own benefit and profit, knowing that these individuals qualified for more favorable loans.

61.     This policy by the defendants of targeting seniors with high credit scores for stated income loans and extending worse loan terms than the borrower qualified for had a disparate impact on elderly borrowers.

62.     By the actions described above, Defendants have discriminated against Plaintiff in the availability and terms of conditions of credit on the basis of age in violation of 15 U.S.C. § 1691(a)(1).

## FOURTH CAUSE OF ACTION

### Against All Defendants

### GENERAL BUSINESS LAW § 349 ("THE DECEPTIVE PRACTICES ACT")

63.     Plaintiff repeats and realleges paragraphs 1 through 62 as though fully set forth herein.

64.     Upon information and belief, defendants conducted a business and furnished a service as those terms are defined in New York State General Business Law § 349 (the "Deceptive Practices Act").

65.     Defendants violated the Deceptive Practices Act in that their acts were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business.  Such acts include, but are not limited to:

        a.     Taking gross advantage of an elderly man who clearly exhibited signs of dementia

14

by inducing him to refinance his 5.95% fixed-rate mortgage;

b. Extending a loan that was wholly inappropriate for a retired person on a fixed income;

c. Misrepresenting to Mr. Ferguson that he was refinancing at a 1% interest rate, when in fact that rate lasted for only six weeks;

d. Extending a mortgage to Mr. Ferguson without disclosing that the monthly payment did not cover interest and resulted in an increase in the principal amount each month, and capping the principal at 110% of the amount loaned;

e. Including a 3-year prepayment penalty in violation of New York General Obligations Law § 5-501(3)(b).  In addition, by computing the prepayment penalty as six months' interest on the principal balance, the prepayment penalty increases along with the principal.  Furthermore, the principal will reach the 110% cap before three years and therefore add over $15,000 to Mr. Ferguson's principal balance if he attempted to refinance.

f. Including an excessive yield spread premium of 3.25% that was unrelated to any service or benefit provided to Mr. Ferguson. On the contrary, this fee was paid to Global Financial as a reward for inducing Mr. Ferguson to sign a loan on such detrimental terms.

66.    Defendants knew or should have known that Mr. Ferguson could not afford to make the payments on the loan necessary to pay the interest or interest and principal on the loan or sustain the minimum payments.

67.    Defendants' making of a mortgage loan to Mr. Ferguson that defendants knew he could not repay by falsely stating that the interest rate was 1.25% willfully deceived and misled

consumers, specifically Mr. Ferguson, violating § 349.

68.     Defendants' lending to Mr. Ferguson without consideration of his ability to repay the mortgage constitutes an unfair, misleading, and deceptive trade practice under § 349.

69.     Defendants' willful and malicious steering of Mr. Ferguson into a loan with a grossly unfavorable terms based on yield spread premium incentives constitutes an unfair, misleading, and deceptive trade practice under § 349.

70.     Plaintiff seeks an order pursuant to § 349(h) enjoining Indymac and Global Financial from the unlawful actions and practices under the Deceptive Practices Act described in paragraphs xx-xx.

71.     As a result of their violations of the Deceptive Practices Act, Indymac and Global Financial are liable to Mr. Ferguson for:

      a.  Actual damages;

      b.  Statutory damages as provided by § 349(h);

      c.  Treble damages as provided by § 349(h);

      d.  Costs and disbursements; and

      e.  Attorneys' fees to Legal Services for the Elderly in Queens.

### FIFTH CAUSE OF ACTION
#### Against Global Financial
#### FRAUD

72.     Plaintiff repeats and realleges paragraphs 1 through 71 as though fully set forth herein.

73.     Defendant fraudulently, intentionally, and knowingly induced Mr. Ferguson to enter into the subject mortgage by misrepresenting and/or failing to provide material information, including the following:

    a.  Misrepresenting to Mr. Ferguson that the annual interest rate on the subject mortgage was fixed at 1%; and

    b.  Taking advantage of Mr. Ferguson's limited mental capacity to trick him into signing a document that they knew he did not understand.

74.    Mr. Ferguson suffered injury and is in danger of losing his home of over 30 years as the proximate result of his reliance on defendants' intentional misrepresentations and failures to disclose.

75.    As a result of the aforesaid fraud, the mortgage loan transaction should be declared void, and the security interest created under the transaction should be terminated. In addition, defendants are liable to Mr. Ferguson for:

    a.  Actual damages;

    b.  Punitive damages;

    c.  Costs and disbursements; and

    d.  Attorneys fees to Legal Services for the Elderly in Queens.

### SIXTH CAUSE OF ACTION
**Against All Defendants**
**GENERAL OBLIGATIONS LAW § 5-501**

76.    Plaintiff repeats and realleges paragraphs 1 through 75 as though fully set forth herein.

77.    The subject loan is secured by an interest in real property improved by a one-family residence occupied by the owner, and the interest rate charged on that loan exceeds six percent per annum.

78.    The prepayment penalty imposed on the subject loan has a term of three years, in violation of § 5-501(3)(b).

79.     As a result of the aforesaid violation, the mortgage transaction should be declared void, and the security interest created under the transaction should be terminated, pursuant to § 5-511.

## SEVENTH CAUSE OF ACTION

### Against Indymac

**NEW YORK REAL PROPERTY ACTIONS AND PROCEEDINGS LAW, ARTICLE 15**

80.     Plaintiff repeats and realleges paragraphs 1 through 79 as though fully set forth therein.

81.     Plaintiff brings this claim pursuant to Article 15 of the New York State Real Property Actions and Proceedings Law to compel the determination of any claims adverse to those of plaintiff in the premises known as 685 Park Place, Brooklyn, NY 11216. Through this action, plaintiff seeks quiet title to the subject property by having declared as void the fraudulent mortgage held by Indymac.

82.     Plaintiff is the sole owner of the property. He initially acquired an interest in the property in 1975, and became sole owner of the premises in 1998.

83.     Indymac may claim that it has a lien against the property for approximately $445,000. However, Indymac does not have a valid security interest because Mr. Ferguson was fraudulently induced into refinancing his mortgage by being falsely told that his new interest rate would be fixed at 1%. Furthermore, upon information and belief, Mr. Ferguson had dementia at the time of the loan and did not have the mental capacity to engage in transactions involving the refinance of his home. The fraud perpetrated by Defendants renders the security interest void.

84.     Upon information and belief, no party who is or should be a defendant is or might be an infant, mentally retarded, mentally ill or an alcohol abuser.

18

85.     Upon information and belief, the judgment to be entered in this action will not affect a person or persons not in being or ascertained at the commencement of this action, who by any contingency contained in a devise or grant or otherwise, could afterward become entitled to a beneficial estate or interest in the property; moreover, every person in being who would have been entitled to such interest in the property if such contingency happened immediately prior to the commencement of this action are parties hereto.

86.     Accordingly, plaintiff is entitled to a judgment pursuant to R.P.A.P.L. § 1515 declaring that the mortgage with Indymac dated February 15, 2006 is void and has no effect.

WHEREFORE, in light of the foregoing, plaintiff Simeon Ferguson respectfully requests that this court:

a.   rescind the underlying mortgage loan transaction and terminate any security interest in plaintiff's property created under the transaction;

b.   enjoin enforcement of the mortgage and note and declare the mortgage and note unenforceable;

c.   award actual damages in an amount to be determined at trial;

d.   award statutory damages;

e.   award punitive damages in an amount to be determined at trial;

f.   award liquidated damages;

g.   award attorneys' fees;

h.   award reasonable costs of this action;

i.   enjoin defendants from engaging in deceptive acts and practices that affect consumers in

New York State under NY General Business Law § 349(h);

j.   declare the mortgage void, and terminate the security interest pursuant to § 5-511; and

k.   award such other and further relief as this court deems just and proper.

Dated: February 14, 2008
      Queens, NY

                                _____/s/_____

                                Donna Dougherty, Esq. (DD-3058)
                                Legal Services for the Elderly in Queens
                                97-77 Queens Blvd., Suite 600
                                Rego Park, NY 11374

                                John C. Gray, Project Director
                                Jessica Attie, Of Counsel (JA-1817)
                                South Brooklyn Legal Services
                                105 Court Street, 3rd Floor
                                Brooklyn, NY 11201

                                Attorneys for Plaintiffs Simeon Ferguson and
                                Karlene Grant